Ramon Rodriguez-Torres and Gudelia Rodriguez-Torres v. Commissioner.
Rodriguez-Torres v. Commissioner
Docket No. 5709-66.
United States Tax Court
T.C. Memo 1970-76; 1970 Tax Ct. Memo LEXIS 281; 29 T.C.M. (CCH) 343; T.C.M. (RIA) 70076; March 31, 1970, Filed. Albert B. Lewis and Leonard Alterwein 4 E. *285 43rd St., New York, N. Y. for the petitioners. Stanley J. Goldberg, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in petitioners' 1964 Federal income tax in the amount of $1,089.82. The only issue for decision is whether petitioners are entitled, under section 172 of the Internal Revenue Code of 1954, [1] to a net operating loss carryover in 1964 for certain losses resulting from the confiscation or seizure by the Cuban Government of Ramon Rodriguez-Torres' private medical practice and his stock in a private hospital corporation, Clinica F and 25th, S.A. Respondent has conceded on brief, and petitioners agree, that with respect to a loss incurred on stock owned in Maquinas de Coser Jotor, 344 petitioners are entitled to a short-term loss carryover of $1,000 in 1964 under section 1212(b)(2). Findings of Fact Some of the facts are stipulated and so found. The stipulations and exhibits attached thereto are incorporated by this reference. Ramon Rodriguez-Torres (sometimes *286 hereinafter referred to as Ramon or petitioner) resided in Brooklyn, New York, at the time the petition herein was filed. He and his wife, Gudelia Rodriguez-Torres, filed a joint income tax return for the year 1964 with the district director of internal revenue, Brooklyn, New York. Gudelia Rodriguez-Torres is involved in this case only because she filed a joint income tax return with her husband. Ramon was born in Cuba on March 6, 1926, and was formerly a citizen of that country. He became a naturalized citizen of the United States on April 18, 1967, and is presently a physician, licensed to practice in the State of New York, and a director of cardiology at the State University of New York, Downstate Medical Center, Brooklyn, New York. After receiving his medical degree in 1951 from the School of Medicine, Havana University, Ramon set up practice in Havana, Cuba, at an office on 29th Street, Vedado. He remained at that location until 1959 when he moved into a professional building at Paseo and 17th Street, Vedado, Havana, Cuba. At that time Ramon and two other physicians purchased a cooperative apartment in the professional building which was used as an office for their separate *287 medical practices. The apartment consisted of three offices for the doctors, a common waiting room, two examining rooms and one dark room. Its price was $30,000, of which Ramon's share was $10,000, which he paid partly in cash and the rest by mortgage. In 1954, Ramon invested in a private hospital corporation, named Clinica F and 25th, S.A. (sometimes hereinafter referred to as Clinica), with seven other doctors, each investing approximately $5,000. He was issued stock certificate number 1 at the time of incorporation. Two of the original eight incorporators withdrew from their ownership shortly before November 15, 1957, in order to join Castro's revolutionary movement. When they left, their interest was redeemed or purchased by the corporation from its capital and earnings. On November 15, 1957, certificate number 1 was canceled and Ramon was issued certificate number 2 to represent his new share in the corporation after the withdrawal of the two physicians. Certificate number 2 represented 129 shares of stock, numbered 130 to 258, at a nominal value of 100 pesos per share (one peso represented $1 in American currency at that time). The total value of the new certificate, $12,900, *288 consisted of Ramon's original $5,000 investment, increased by an additional sum capitalized from earnings and the reinvested profits of the corporation. Ramon paid no additional money for this certificate. Ramon left Cuba on October 9, 1960, flying to Puerto Rico via Miami, and his family followed him there on October 12, 1960. At the time of his departure from Cuba, Ramon had both a Cuban passport and a tourist visa, issued by the American Consulate in Havana, which he used to enter Puerto Rico. His departure was a result of political differences between himself and the Cuban Government then in power. At the time, he intended to return once Cuba's then Government was no longer in power. Sometime during 1961, While in Puerto Rico, Ramon obtained an exile visa from American authorities. After being employed for a short time as an intern in a Puerto Rican hospital, Ramon came to Brooklyn, New York, with his family on October 31, 1961. When Ramon left Cuba, he had a relative, Abraham Rodriguez, watch over his private medical office, make the payments on the mortgage and pay his secretary's salary. The mortgage payments were stopped in January 1961. In February 1961, the Cuban Government *289 physically took over the private medical office and the assets thereof, which consisted of medical equipment, office furniture and supplies, and an automobile. The total fair market value of these assets (other than the apartment itself) was approximately $15,000. An itemized schedule of these assets and their approximate fair market value at the time Ramon left Cuba is as follows: *10 SCHEDULE OF EQUIPMENT
1. X-ray Machine
$2,000.00
View Box 75.00 $2,075.00
2. Furniture in waiting room
650.00
3. Examination Room A Special table for Electrocardiograph
$200.00
Air Conditioner
450.00
2 - Scales
$150.00
Sterilizer
50.00
Examination Tables
350.00
Cabinet
100.00
Electrocardiograph Machine
1,200.00
Ballisto Cardiograph
200.00
Surgical instruments 300.00
$3,000.00
4. Examination Room B Westshalling instruments
$200.00
R.F. ThermoCautery
100.00
Sphygmomanometer
100.00
Air Conditioner
450.00
Medicine cabinet and medicine
200.00
Medical bag 100.00
1,150.00
5. Dark Room
Linen and uniforms
$150.00
Basil Metals
300.00
Oscillometer 75.00 525.00
6. File Room
Stationery Prescriptions
$100.00
Ifle cabinets
240.00
Stereo-Hi-Fi 240.00
580.00
7. Library
$3,000.00
8. Office
Desk
$500.00
Chairs
400.00
Air Conditioner
450.00
Library shelving, Clocks, etc. 500.00
1,850.00
9. Datsun automobile
2,000.00
10. Miscellaneous medical supplies 170.00
Total $15,000.00
*290 The Datsun automobile, listed in the itemization, was purchased in late 1959 or early 1960. On May 8, 1962, Clinica was taken over by the Cuban Government and operated thereafter by them. Before the seizure, this enterprise was operating as an independent concern on a profitable basis. On December 5, 1961, prior to the seizure of Clinica, Cuban Law Number 989 was enacted. The translated version of this decree reads in pertinent part as follows: Translation 19,404 February 23, 1962 Law No. 989 of December 5, 1961 published in the Official Gazette of December 6, 1961. I, OSVALDO DORTICOS TORRADO, President of the Republic of Cuba, do hereby make known that the Council of Ministers has approved and I have ratified the following: WHEREAS: It is evident that some persons belonging to the classes affected by revolutionary measures have abandoned the country with unpardonable disdain for their Fatherland; WHEREAS: The majority of such persons own in Cuba different assets which should be placed at the disposal of the people and this calls for regulations of the departures and reentry into national territory as well as of the use to be made of the abandoned property; NOW, *291 THEREFORE, in use of the authority conferred on it the Council of Ministers decides to enact the following Law No. 989: Article 1. - The Ministry of the Interior shall be in charge of granting exit permits and reentry permits to persons who abandon the national territory. If the return does not occur within the period of time for which the departure was authorized it will be considered that there has been a final abandonment of the country. Article 2. - In the case of the persons covered by the second paragraph of Article 1, all personal property, real property, or any other property, rights or securities of any kind, belonging to them, shall be deemed nationalized pursuant to confiscation in favor of the Cuban State, and the property shall be assigned to the corresponding Government bureau. * * * Transitory Provision. - Those persons who have abandoned the national territory before September 14, 1961 with the permission of the Superior Council of the Urban Reform Law or any of the officers of that body may request, prior to the termination of such period, ratification of the exit permit by the Minister of the Interior with regard to their return to Cuba. The Minister of the *292 Interior shall in his discretion decide whether reentry will be permitted. In their 1964 income tax return petitioner and his wife claimed as an "Other deduction" on page 2 of the return the following "CASUALTY LOSS BY THE CUBAN GOVERNMENT OF MY PROPERTY (I AM A MEDICAL DOCTOR) NET VALUE OVER $100,000 CLAIMING CASUALTY LOSS OF $7,000." No deduction for any loss had been previously claimed by petitioner and his wife in their joint income tax returns filed for the 346 period November 1, 1961 to December 31, 1961, and for the taxable years 1962 and 1963. Respondent disallowed the claimed deduction for 1964 and in his explanation stated: (a) This claimed loss is disallowed as unsubstantiated and/or because you have not shown that it is allowable under any section of the Internal Revenue Code of 1954. Opinion Petitioner incurred losses as a result of the confiscation or seizures by the Cuban Government of his private medical practice and his stock in Clinica. He contends: (1) that with respect to both these losses he is entitled to a net operating loss carryover in 1964 under section 172(a), [2] and (2) that he has properly elected under section 1.172-11, Income Tax Regs. *293 , [3] to take advantage of the 10-year carryover provisions of subsection 172(b)(1)(D), [4] which allow a 10-year carryover for losses attributable to a foreign expropriation as defined in subsection 172(k). [5]
*294 As we understand respondent's argument, he contends that the loss relating to Clinica is not a loss which may be considered in ascertaining the net operating loss as it is defined under subsections 172(c) and (d), infra. As for the loss of Ramon's private medical practice, respondent concedes that this is a loss subject to carryover computation as a section 165(c)(1)[6] *295 loss, but 347 contends that Ramon has failed to substantiate the amount of such loss, and is therefore not entitled to any deduction. The parties agree that the expropriation loss of Ramon's private practice occurred in 1961, therefore any proved loss resulting therefrom is a proper carryover loss to 1964 under section 172(b)(1)(B), and we need not and do not reach the question of the sufficiency of petitioner's attempted election under regulations section 1.172-11, supra. It is well settled that confiscation by officials under color of legal authority, although arbitrary and despotic, is not a theft or casualty loss under section 165(c)(3). William J. Powers, 36 T.C. 1191 (1961); cf. Weinmann v. United States, 278 F. 2d 474 (C.A. 2, 1960), affirming 177 F. Supp. 562 (S.D.N.Y. 1959). Hence, Ramon's loss on Clinica cannot be included in the net operating loss computation by virtue of 172(d)(4)(C)'s "casualty or theft" loss exception to the general rule that a deduction must be attributable to a trade or business. Ramon was not engaged in the *296 business of buying and selling securities. He owned only two stocks during relevant times. Under no stretch of the imagination was he a dealer in securities. Accordingly, his loss on his Clinica stock was not attributable to a trade or business, and hence, it was not subject to the carryover provisions of section 172. With regard to this loss, we hold for respondent. 348 As to petitioner's loss of his private medical practice, the apartment office and all other assets were seized in February 1961. Respondent agrees that this loss was clearly one incurred in Ramon's trade or business at the time of the seizure and resulted in a closed and completed transaction as required by section 1.165-1(b), Income Tax Regs.[8] See Rev. Rul. 62-197, 1962-2 C.B. 66, 69-70. Hence it is a deductible loss in 1961 under subsection 165 (c)(1), [9] insofar as the amount thereof is substantiated. Respondent asserts that petitioner has failed to substantiate the amount and hence that it can neither be deducted nor carried over. *297 Under section 165(b), [10] the amount of a loss deductible under section 165 is the adjusted basis of the property under section 1011, [11] which is defined as the basis determined under section 1012, [12] i.e., cost, adjusted as provided in section 1016. The pertinent adjustment for our consideration contained in 1016(a)(2), [13] requires that the cost of an item be reduced by the depreciation taken by the taxpayer, or by an amount which would represent depreciation as determined under section 167(b)(1), the straight-line method. Since petitioner did not depreciate any of this property on his income tax returns, it becomes necessary to compute a depreciated value under the straight-line method in order to ascertain the amount of the deductible loss. This in turn necessitates a knowledge of the cost of the equipment, any capital additions or improvements, its useful life, and salvage value. Section 1.167(b)-1, Income Tax Regs.
*298 Unfortunately the record in this case simply does not supply the necessary facts to compute depreciation on the equipment, other than the Datsun automobile and the three small "expense" items which are treated infra. The only evidence introduced was the itemized list of the fair market value of the office equipment as of the time he left Cuba, written from memory by Ramon, and his estimates as to the purchase prices and purchase dates of the Datsun automobile and the X-ray machine. With regard to the automobile, Ramon testified that it was purchased in late 1959 or early 1960 at a price of approximately $2,500. The fair market value estimates of the equipment and other estimates as to the X-ray machine amounted to mere guesses, and we can give them no weight. The evidence as to the car, however, is sufficient to allow us to estimate its depreciated basis in Ramon's hands at the time of expropriation, when the internal revenue guidelines for depreciation are taken into account. 349 These guidelines provide that the useful life of an automobile used in a business is three years. Rev. Proc. 62-21, 1962-2 C.B. 419. It is true that the evidence regarding the *299 Datsun is inexact and unsupported by documents or records, but we cannot expect one who is fleeing from a tyrant to pause for the gathering of records, nor will we penalize his failure in this regard. We know that the automobile was a little over a year old at seizure. Considering the three-year term, petitioner's testimony regarding cost, and weighing against petitioner as we must because of the sketchy record, Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2, 1930), we allow a deduction of $1,500. We next consider the possibility of any deduction by reason of the expropriation in 1961 of the "cooperative apartment" in which Ramon conducted his private medical practice. Again the record affords absolutely no ground basis upon which any deduction could be allowed. Petitioner states that in 1959 he paid $10,000 [14] to purchase a "cooperative apartment" in which to practice medicine with two other doctors, but exactly what he purchased is never made clear. The building is nowhere described. There is no attempt at allocation as between real estate and the improvement (see the exception granted as to real property by section 172(d)(4)(A)(ii), supra, allowing expropriated *300 real property as a deductible loss attributable to the trade or business if used in connection therewith). The above evidence affords no basis for computing any loss under section 165(b), other than for the automobile. However, we observe that the itemized list of office equipment discussed above contains three depreciable items which are typically and universally referred to as "expense" items since they usually depreciate or are depleted in such a short period of time that a depreciation term of one year is contended for and allowed. These items are: linen and uniforms, $150; stationery and prescriptions, $100; and miscellaneous medical supplies, $170. So considered, these items are within the meaning of section 172(d)(4)(A)(i), supra, and are therefore deductible and properly carried over under section 165(a) and section 172(a), both supra. To reflect allowance of these three items, the Datsun automobile, and to reflect concessions of the respondent, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the 1954 Code unless otherwise indicated.↩
2. SEC. 172. NET OPERATING LOSS DEDUCTION. (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection. ↩
3. Sec. 1.172-11 Election with respect to portion of net operating loss attributable to foreign expropriation loss. (a) In general. If a taxpayer has a net operating loss for a taxable year ending after December 31, 1958, and if the foreign expropriation loss for such year (as defined in paragraph (b)(1) of this section) equals or exceeds 50 percent of the net operating loss for such year, then the taxpayer may elect (at the time and in the manner provided in paragraph (c)(1) or (2) of this section, whichever is applicable) to have the provisions of this section apply. * * * (c) Time and manner of making election - * * * (2) Taxable years ending after December 31, 1958, and before January 1, 1964. In the case of a taxpayer who has a foreign expropriation loss for a taxable year ending after December 31, 1958, and before January 1, 1964, the election referred to in paragraph (a) of this section shall be made by filing on or before December 31, 1965, with the district director for the district in which the taxpayer filed his income tax return for the taxable year of such foreign expropriation loss, a statement containing the information required in subparagraph (3) of this paragraph. Such election shall be irrevocable after December 31, 1965. See paragraph (d) of this section for special rules relating to taxable years affected by an election under this subparagraph. (3) Information required. The statement referred to in subparagraphs (1) and (2) of this paragraph shall contain the following information: (i) The name, address, and taxpayer account number of the taxpayer; (ii) A statement that the taxpayer elects under section 172(b)(3)(C)(ii) or (iii), whichever is applicable, to have section 172(b)(1)(D) of the Code apply; (iii) the amount of the net operating loss for the taxable year; and (iv) The amount of the foreign expropriation loss for the taxable year, including a schedule showing the computation of such foreign expropriation loss. In addition, if a taxpayer makes the election under subparagraph (2) of this paragraph, the taxpayer shall specify the internal revenue district in which he filed his return for the three taxable years immediately preceding the taxable year of the foreign expropriation loss. If there is an increase or decrease in tax attributable to the election under subparagraph (2) of this paragraph for any taxable year preceding or succeeding the taxable year of the foreign expropriation loss, amended returns or claims for refund should be filed with the office of the district director with whom the taxpayer files his income tax return for the taxable year in which such election is made. ↩
4. SEC. 172(b)(1)(D)↩ In the case of a taxpayer which has a foreign expropriation loss (as defined in subsection (k)) for any taxable year ending after December 31, 1958, the portion of the net operating loss for such year attributable to such foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 10 taxable years following the taxable year of such loss; 5. SEC. 172(k). Foreign Expropriation Loss Defined. - For purposes of subsection (b) - (1) The term "foreign expropriation loss" means, for any taxable year, the sum of the losses sustained by reason of the expropriation, intervention, seizure, or similar taking of property by the government of any foreign country, any political subdivision thereof, or any agency or instrumentality of the foregoing. * * * (2) The portion of the net operating loss for any taxable year attributable to a foreign expropriation loss is the amount of the foreign expropriation loss for such year (but not in excess of the net operating loss for such year).↩
6. SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; A net operating loss is defined in subsection 172(c) as follows: SEC. 172(c). Net Operating Loss Defined. - For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d). The pertinent modifications for our consideration contained in subsection 172(d) are: SEC. 172(d). Modifications. - The modifications referred to in this section are as follows: * * * (2) Capital Gains and Losses of Taxpayers Other Than Corporations. - In the case of a taxpayer other than a corporation - (A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from sales or exchanges of capital assets; and (B) the deduction for long-term capital gains provided by section 1202 shall not be allowed. * * * (4) Nonbusiness Deductions of Taxpayers Other Than Corporations. - In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business. For purposes of the preceding sentence - (A) any gain or loss from the sale or other disposition of - (i) property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or (ii) real property used in the trade or business, shall be treated as attributable to the trade or business; (B) the modifications specified in paragraphs (1), (2)(B), and (3) shall be taken into account; (C) any deduction allowable under section 165(c)(3) (relating to casualty losses) shall not be taken into account; and It is clear from the above subsections that in order for a loss to be included in computing the net operating loss, it must be a deductible loss under some other section of chapter 1. Moreover, the effect of subsection 172(d)(4)'s modification is to preclude from the computation of the net operating loss of an individual taxpayer, any deduction which is not attributable to a trade or business, Charles Weill, 17 T.C. 318 (1951); Mae E. Townend, 27 T.C. 99 (1956), unless it be a section 165(c)(3)
SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *
[7]↩ casualty loss. 8. Sec. 1.165-1 Losses. * * * (b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and except as otherwise provided in section 165(h)↩ and section 1.165-11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss. 9. SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩
10. SEC. 165(b)↩ Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. 11. SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016. ↩
12. SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). * * * ↩
13. SEC. 1016. ADJUSTMENTS TO BASIS. (a) General Rule. - Proper adjustment in respect of the property shall in all cases be made - * * * (2) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount - (A) allowed as deductions in computing taxable income under this subtitle or prior income tax laws, and (B) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this subtitle (other than chapter 2, relating to tax on self-employment income), or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this subtitle or prior income tax laws. Where no method has been adopted under section 167 (relating to depreciation deduction), the amount allowable shall be determined under section 167 (b)(1).↩
14. Petitioner contends for only a $7,500 loss by his reply brief, but the reason for the $2,500 reduction is not entirely clear.↩